ON MOTION FOR REHEARING
 

 MAY, J.
 

 On motion for rehearing, the former husband has called our attention to distinctions between this case and our opinion in
 
 Linstroth v. Dorgan,
 
 2 So.3d 305 (Fla. 4th DCA 2008). For the reasons which follow, we grant the motion for rehearing, vacate our previously issued opinion, and substitute the following.
 

 The parties were divorced in 1988. In the final judgment, the trial court awarded the former wife permanent periodic alimony of $4,000 a month. In 1993, the former husband requested a reduction in alimony based upon the former wife’s cohabitation with Mr. Bradford. The court granted the modification based upon a substantial change in circumstances and reduced the monthly alimony to $3,400.
 

 In 2005, the former husband filed a supplemental petition for modification, seeking to reduce or terminate alimony based upon the former wife’s continued, long-term relationship with Mr. Bradford. The former wife filed a counter-petition seeking to increase the alimony payments. After finding that a supportive relationship existed between the former wife and Mr. Bradford, the trial court denied both motions. From this order, the former husband appealed. He argues that the trial court erred in failing to reduce or terminate alimony payments. We agree and reverse.
 

 Section 61.14(l)(b)l., Florida Statutes (2006) provides for the reduction or termination of alimony “upon specific written findings by the court that since the granting of a divorce and the award of alimony a supportive relationship has existed between the obligee and a person with whom the obligee resides.” The obligor bears the burden “to prove by a preponderance of the evidence that a supportive relationship exists.”
 
 Id.
 
 The statute then provides a non-exclusive list of eleven factors to be considered by the trial court in determining the existence of a supportive relationship. § 61.14(l)(b)2., Fla. Stat. (2006).
 

 The statute recognizes “that relationships do exist that provide economic support equivalent to a marriage and that alimony terminable on remarriage may be reduced or terminated upon the establishment of equivalent equitable circumstances ....”§ 61.14(l)(b)3., Fla. Stat. (2006). In other words, a supportive relationship, while not a
 
 de facto
 
 marriage, takes the financial place of a remarriage and necessarily decreases the need of the obligee. Thus, once a trial court makes a finding
 
 *7
 
 that a supportive relationship exists, it must by necessity either reduce or terminate alimony because the obligee’s need has changed. If the trial court does neither, it renders both the trial court’s findings and the statute meaningless.
 

 Here, the former wife has been living with another man with all the trappings of a marriage, without the formal legality of one, for longer than she was married to the former husband. In its final judgment, the trial court made the following findings of fact with regard to the statutory factors to be considered in determining the existence of a “supportive relationship.”
 

 • The former wife has been residing with Mr. Bradford, unrelated to her by consanguinity or affinity, since August of 1990 and they presently intend to do so permanently. The relationship is an intimate one. For ten years after Mr. Bradford moved to South Florida, they resided together exclusively in the former wife’s home in Florida.
 

 • In 2000, Mr. Bradford retired and purchased a home in North Carolina. For the following years, the couple resided in North Carolina for six months in the summer and in Florida for six months in the winter. In June, 2004 the former wife sold her Florida home and the couple resided exclusively in North Carolina until the former wife purchased another home in Florida in 2005. They use each other’s residences as common mailing addresses, use the Florida residence on their Florida driver’s licenses, share cooking and household responsibilities, and sleep together in the same room. They are seldom apart and travel together abroad.
 

 • The former wife has a checking account as does Mr. Bradford. In 1997, they added each other on their respective checking accounts in the event that one would have to pay the bills of the other during a period of incapacity. However, neither has written a check on the other’s account. Each uses their own account to pay their own bills. They have not comingled their funds. While they share an American Express account, they each maintain separate cards and mostly pay their separate expenses on their respective cards. Occasionally, a joint expense charged on one card is paid by one or the other.
 

 • The couple purchased a 1998 Ford Explorer in joint names and they maintain, the insurance jointly. The former wife has two other cars and pays for that insurance.
 

 • When the former wife bought the new Florida home, Mr. Bradford loaned her $45,600 to replace the roof on the older home and to put a deposit on the new home. There was no written note and no interest charged on the loan, but the loan was paid in full upon the sale of the older home. For a year between the sale and purchase of the Florida homes, the former wife lived with Mr. Bradford in his North Carolina home free of charge.
 

 • The former wife and Mr. Bradford each pay the expenses connected with their own homes and do not contribute to the other’s expenses. Neither pays rent to the other. The former wife benefits from the flight privileges belonging to Mr. Bradford. They charge their common living expenses on their joint credit card. The former wife keeps a ledger of expenses she pays for Mr. Bradford and vice versa. When there is a difference of a couple of hundred dollars, one party reimburses the other.
 

 
 *8
 
 • Each performs valuable services for the other. They have an exclusive and permanent conjugal relationship. They share cooking and housekeeping responsibilities. They travel together, are the health care advocates and caretakers of each other, and enjoy the benefits afforded by dual home ownership. Both are unemployed.
 

 • They agree that each has an unrestricted use and enjoyment of the other’s real estate. Mr. Bradford has provided for the former wife to receive his home and retirement account upon his death. Mr. Bradford has not provided for the suppoi't of the former wife’s child.
 

 The
 
 former
 
 wife’s net worth had increased from $97,000 at the time of the divorce to over $900,000.
 
 [1]
 
 Significantly, the former wife’s living expenses had decreased. She had no mortgage on her Florida home and no ongoing debts. And, she lived half the year free under Mr. Bradford’s roof.
 

 These facts led to the trial court’s inevitable conclusion that a supportive relationship existed — a relationship that by definition reduced the need of the former wife. The very purpose of section 61.14(b), Florida Statutes (2006) is to recognize the “economic support” that results when ostensibly independent individuals chose to live under one roof in a “supportive relationship.” § 61.14(l)(b)l., 3., Fla. Stat. (2006). The statute equates such a relationship with “economic support equivalent to a marriage” and requires a reduction or termination of alimony. § 61.14(l)(b)3., Fla. Stat. To find that such a relationship exists, but find no reduction in need is a
 
 non sequitur.
 

 There are no doubt many cases in which the evidence does not support the existence of a “supportive relationship,” but when the evidence does, and the trial court uses its discretion in making that factual finding, then alimony must be affected in some manner. This is so regardless of the party’s clever handling of finances and real estate holdings in an attempt to avoid the impact of the statute.
 

 Here, the former wife is worth ten times more than she was at the time of the final dissolution of marriage. Her net worth is not
 
 de minimus. She
 
 is in a supportive relationship. She enjoys dual residency, living six months of the year in a home where she bears no expenses and the other six months in a home owned by her where she pays expenses, but has no mortgage.
 
 [2]
 
 That supportive relationship reduced the wife’s need for alimony, the extent to which the trial court has the discretion to determine.
 

 While we believe that
 
 Linstroth
 
 was correctly decided on its facts, the case is distinguishable because the trial court there found that the former wife was not in a supportive relationship. Its findings and conclusion were supported by substantial competent evidence. And, the facts were substantially different from those presented in this case. Nevertheless, there is much to be gleaned from Judge Farmer’s dissent.
 

 
 *9
 
 When the Legislature voted on this statute, the existing legal landscape held that the courts had no power to treat cohabitation as having the same effect on alimony that remarriage produces. With remarriage, the central reason for terminating alimony was tied to the justification for the award of alimony in the first place. If alimony is intended as support for a former spouse having a need, and the former spouse has now entered into a supportive relationship in which she receives the kind of support found in marriage, what is the justification for requiring her former spouse also to continue supporting her? Why should the law require that a previously married person be supported by two separate members of the opposite sex: one from whom she is divorced and one with whom she is cohabiting? For purposes of the policies justifying a termination of alimony, what would be the rationale for distinguishing between remarriage and mere cohabitation in a supportive relationship?
 

 Linstroth,
 
 2 So.3d 305, 314 (Fla. 4th DCA 2008) (Farmer, J., dissenting).
 

 This case provides the perfect set of facts in which to test the efficacy of section 61.14, Florida Statutes (2006). Based on the facts presented here and the affirmative finding by the trial court that the former wife is in a supportive relationship, some reduction, if not termination, in alimony is warranted. We therefore reverse and remand the case for further proceedings.
 

 Reversed and Remanded.
 

 TAYLOR and HAZOURI, JJ., concur.
 

 [1]
 

 . The former wife had almost $400,000 in sheltered income. Her liquid assets had grown from $12,000 to over $550,000, none of which she was using to meet her monthly expenses.
 

 [2]
 

 . The former husband's expert testified that the rental value of the former wife's home was $1,700 monthly. Another expert for the former husband testified that the North Carolina home would rent for $1,300-$1,900 per week in peak season and $540-$970 per week in off season. The former wife's expert testified that Mr. Bradford's home would rent for $1,200 monthly.